IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Dianne B. Phillips, | ) | Civil Action No.: 4:03-1622-RBH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| Horry County and Kevin Jordan, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| Richard Kevin Phillips, | ) | Civil Action No.: 4:04-0848-RBH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Horry County and Kevin Jordan, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

These cases involve claims by the plaintiffs against defendants[1] under 42 U.S.C. § 1983 for excessive force in resisting arrest and state law claims for assault and battery, malicious prosecution, and false imprisonment. These cases were originally filed in state court and were removed by the defendants on the basis of federal question jurisdiction. Pending before the Court are Defendants Horry County and Kevin Jordan's motion to dismiss, to strike and/or for summary judgment and two motions *in limine* filed by plaintiffs. Pursuant to Local Civil Rule 7.08 the Court will determine these motions without a hearing.

---

[1] Kevin Jordan has been sued only in his individual capacity.

1

**Facts**[2]

These actions arise out of the arrest of plaintiffs Diane and Richard Kevin Phillips on the night of March 3, 2002, outside of their mobile home. Officer Jordan responded to a dispatch call, which originated from the Town of Loris Police Department, requesting a police escort for Paula Bryan Hodge, Mrs. Phillips's seventeen (17) year old daughter, to retrieve personal belongs from the Phillips home. Jordan received the dispatch call from an Horry County Dispatcher. Jordan testified in his deposition that he was told "[t]o go to the Loris Police Department and meet with the complainant about an escort." (Jordan Depo. p. 15.) When asked who the "complainant was, Jordan responded, "I don't recall the girl's name. I think it was Ms. Phillips' daughter." (Jordan Depo. p. 15.) The plaintiffs claim, and Paula's deposition testimony supports their claim, that Paula did not want or feel she needed a police escort to the Phillips home. However, Paula's father, James Bryan, felt differently and requested police assistance. Paula's father, step-mother, younger sister, and boyfriend all went with Paula to get her things.

Paula and her father met Officer Jordan and another Myrtle Beach Police Officer, Officer Anthony Sawyer, at the Loris police department. Prior to the arrival of the officers, Paula and her father talked to the Loris Police Department dispatcher. Plaintiffs allege that Paula told the Loris Police Department dispatcher that she did not want a police escort. Additionally, plaintiffs allege that James Bryan informed the Loris Police Department dispatcher that the Phillips did not want Patrick Hodge,

---

[2] As plaintiffs are the non-moving parties in the motion to dismiss, strike and/or for summary judgment, this Court will view the facts in the light most favorable to them as the non-moving parties.

2

Paula's then-boyfriend,[3] on their property.[4]

Horry County Police Officer Anthony Sawyer accompanied Jordan on the escort to the Phillips trailer. When questioned as to what he knew regarding why they were requested to go to the Phillips home the following exchange occurred:

> Q:     Tell me what they told you.
> A:     They told me that the young girl was going to stay with her father in North Carolina and that she wanted to go over and pick up some things from, her clothes from her mother's house, and —
> Q:     Anything else?
> A:     I'm trying to remember your question, what they told you?
> Q:     Yes.
> A:     That's what they told me.
> Q:     Did they tell you **why they needed a police officer** to go?
> A:     Yes, sir, **they expected Mrs. Phillips to**, I think the girl's words were, "**Throw a fit**."
> Q:     Well, did you ask her why?
> A:     Yes, sir.
> Q:     What did they tell you?
> A:     My question to her was did her mother know that she was coming and did she agree with her going to live with her father, and she said, "Yes," but that **she knew her mother and she expected her mother to throw a fit**.

(Sawyer Depo. p. 15-16 (emphasis added).)

Officers Jordan and Sawyer followed the Bryan SUV in their marked police cruisers to the Phillips home. It is undisputed that no one told the officers that Mrs. Phillips had instructed Paula not

---

[3] It appears to the Court that at the time of this lawsuit Paula is now married to Hodge since she is referred to in the memos as Paula Bryan Hodge.

[4] The record indicates that Paula began seeing Patrick Hodge against her mother's wishes some time prior to the incident at issue. Mrs. Phillips indicates that she did not want her daughter to see Patrick because he had a criminal record and was older than Paula. The weekend before the incident at issue, Paula ran away from home to live with Patrick Hodge and, with the assistance of the Columbus County North Carolina Sheriff's Department, Mrs. Phillips retrieved Paula from his home. Plaintiffs allege that Paula became increasingly difficult to manage and ran away the next weekend to her father's residence in North Carolina with Patrick. Mrs. Phillips states that Paula told her she was not going to come back home and she told her daughter that, if that was the way she felt, she should come and pick up her clothes and move out. Both Paula and her mother agree that she was told not to bring Patrick with her to pick up her things.

to bring Patrick with her.[5]  Mrs. Phillips was anticipating the arrival of Paula to pick up her things and came out of the house when the Bryan vehicle pulled up.  Mrs. Phillips alleges that when she came out of the house she realized that Patrick Hodge was in the vehicle, and trespassing on her property, and demanded that he be removed from the property immediately.[6]  She states that when she realized Officer Jordan, who had gotten out of his vehicle to talk to her, would not help her, she walked to the door of the Bryan vehicle to request that Patrick leave the property.  It is undisputed that, when she reached for the door handle, Officer Jordan took both hands and pushed her away from the vehicle.  Plaintiffs allege that Jordan told Mrs. Phillips that she did not have the right to tell anyone to leave her property.  It is not disputed that Mrs. Phillips said that everyone except for Patrick could stay.  At this point, Paula and her step-mom, Frances Bryan, got out of the SUV so that James Bryan could take Patrick off of the property.  It is undisputed that Patrick Hodge was removed from the property.

At some point during this series of events, Richard Kevin Phillips came to the front door and asked his wife what was going on.[7]  Mr. Phillips alleges that, Officer Jordan responded that it was none of his business, being very "hostile and rude."  Officer Jordan admitted in his deposition that he told Mr. Phillips that he was not going to leave.  Mr. Phillips alleges that when he realized Officer Jordan was not going to do anything he called 911 and requested that they send someone to remove them from

---

[5] It is plaintiffs' allegation that Officer Jordan failed to do an adequate investigation prior to the escort and that, if he had done an adequate investigation and talked to the Loris dispatcher, he would have learned that Paula did not want the police involved and that Patrick was not wanted on the property.

[6] Defendants allege that Mrs. Phillips came out of the house "yelling and swearing."

[7] Defendants allege that Mr. Phillips came out yelling about people getting off his property, said "I'll take care of it," and then went back inside.  Frances Bryan told Officer Sawyer that Mr. Phillips kept guns in the home and that she was afraid of what might happen.  Officer Jordan states that he and Officer Sawyer took cover behind one of the police cars expecting him to come out with a gun, but when he came back out he had with him a cordless phone.  Defendants allege that Mr. Phillips was still yelling, unaware the Mrs. Phillips had told the Officers that everyone could stay if Patrick was removed from the property.

4

his property.  The 911 transcript reflects that Mr. Phillips told the operator that "two fellows here claim to be county cops that's brought some people on my land.  I've told them to get the people off my land and I've told 'em my last time."  Plaintiffs allege that Officer Jordan came up the porch steps, knocked the phone out of Mr. Phillips hand, and attempted to handcuff Mr. Phillips.[8]  Mr. Phillips alleges that when he asked Officer Jordan what he was doing and why he was being handcuffed, he got no response.  The plaintiffs allege that in handcuffing Mr. Phillips, Jordan caused an aggravation of Mr. Phillips' hernia.

Hearing the struggle, Mrs. Phillips, who had gone inside with Paula to help her gather her things, came to the door.  Plaintiffs acknowledge that Mrs. Phillips got between her husband and Officer Jordan, braced her hands against the door jam, and asked why he was arresting her husband.  Plaintiffs allege that, instead of responding to Mrs. Phillips question, he put one handcuff on her and then, holding the handcuff, slung her across the porch railing.[9]  Mrs. Phillips admitted in her deposition that Officer Jordan told her to move out of the way or that she would be arrested.  *See* D. Phillips 63:16-25.  At this point, plaintiffs allege that Officer Sawyer completed handcuffing Mr. Phillips and Jordan completed handcuffing Mrs. Phillips and then dragged her down the porch steps to the police vehicle.[10]  Officer Sawyer took Mr. Phillips to the police vehicle.

Officer Jordan drove the Phillips to the Horry County Detention Center where they were booked

---

[8] Defendants allege that because Mr. Phillips would not calm down Officer Jordan told Mr. Phillips he was under arrest. Officer Sawyer saw Mr. Phillips raise the cordless phone back over his shoulder and, thinking Mr. Phillips was going to hit Officer Jordan, he stepped behind Mr. Phillips.  At that point, Officer Jordan states he placed a handcuff on Mr. Phillips who tried to back into the mobile home.

[9] Defendants allege that Mrs. Phillips fell against the porch railing, that Officer Jordan pulled her up and then finished handcuffing her.

[10] Defendants allege that Officer Jordan walked Mrs. Phillips to the police cruiser.

for breach of the peace.  As reflected in the Booking Report, at the jail Mr. Phillips reported a pre-existing slipped disk, hernia surgery he had six (6) months prior and a wrist abrasion, for which he was treated with ice and ibuprofen.  Mrs. Phillips reported that her back and wrist hurt, but she received no medical treatment.  The Phillips were released on bond the next morning, went home to shower, and then drove to an emergency room in Myrtle Beach.[11]  The emergency room report reflects superficial redness on Mrs. Phillips wrists, as well as back tenderness and a small scratch on her knee.  At the emergency room Mr. Phillips complained of the wrist abrasion as well as recurrence of his umbilical hernia.  Mr. Phillips wrist was cleaned and dressed.  The Phillips received prescriptions for anti-inflammatory drugs and muscle relaxers and discharge instructions for follow up treatment.  The Phillips did not seek any follow-up treatment because they say they could not afford it.

## Summary Judgment Standard

Defendants filed their motion for summary judgment pursuant to Rule 56, FRCP.  The moving party bears the burden of showing that summary judgment is proper.  Summary Judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Rules 56(c), FRCP; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof.  *Celotex*, 477 U.S. 317.  Once the moving party has brought into question whether there is a genuine issue for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).  The non-moving party must come forward with enough evidence, beyond

---

[11] Defendants point that the hospital in Myrtle Beach is about thirty-five (35) miles from the plaintiffs' local hospital.

a mere scintilla, upon which the fact finder could reasonably find for it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. *Shealy v. Winston*, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Barber v. Hosp. Corp. of Am.*, 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at trial on the merits." *Mitchell v. Data General Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993).

## <u>Discussion</u>

This Court will address defendants' motions for summary judgment first, as a decision on that motion may render all other pending motions as moot.[12] Plaintiffs claim that Officer Jordan violated their federal constitutional rights by using excessive physical force during arrest and custody. They claim that Horry County caused the violations by implementing a custom, policy or official act allowing use of unjustified force and by failing to train or supervise their officers on the proper use of force. Plaintiffs claim that these acts and omissions violated their Fourth Amendment right to be free from unreasonable seizure and their Fourteenth Amendment right to due process of law. In their response to the motion for summary judgment, plaintiffs state that Officer Jordan "violated the Fourth and Fourteen[th] Amendment to the Constitution by (1) falsely arresting them, (2) unreasonably assaulting and battering them by using excessive force, (3) falsely imprisoning them, and (4) maliciously prosecuting them."

---

[12] While the motion filed by defendants is to dismiss, to strike and/or for summary judgment, it seems most appropriate to treat the motion as a motion for summary judgment because that is how the parties treated the motion in their memoranda.

Defendants argue that they are entitled to summary judgment on plaintiffs' federal claims because no constitutional violations occurred. Additionally, Kevin Jordan argues that he is entitled to qualified immunity in defense of plaintiffs' claims. Defendants assert that even if a constitutional violation occurred, there is no Horry County custom, policy or oversight condoning excessive force. Finally, defendants argue that there are not liable on the plaintiffs' state law claims.

**Qualified Immunity**

Officer Kevin Jordan has raised qualified immunity in defense of the plaintiffs' claims. Government officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). It protects law enforcement from "bad guesses in gray areas" and ensures that they are liable only "for transgressing bright lines." *Maciariello v. Summer*, 973 F.2d 295, 298 (4th Cir. 1992). State government officials performing discretionary functions enjoy qualified immunity from liability for civil damages unless: (1) the officers' conduct violated a federal statutory or constitutional right; and (2) the right was clearly established at the time of the conduct, such that (3) an objectively reasonable officer would have understood that the conduct violated that right. *Knussman v. Maryland*, 272 F.3d 625, 633 (4th Cir. 2001).

When a defendant asserts qualified immunity, two questions must be considered. First, "whether a constitutional right would have been violated on the facts alleged" by the plaintiff. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). If this question is answered in the affirmative, then the second

question is whether the right asserted was clearly established at the time of the alleged violation. *Id*. In answering this latter question, the relevant inquiry is whether "it would be clear to an objectively reasonable officer that his conduct violated [the] right." *Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002). When determining whether the law is clearly established, courts must make a fact-specific determination. *See Anderson v. Creighton*, 483 U.S. 635, 637-39 (1987).

Under the qualified immunity analysis, a court first must consider whether a constitutional right would have been violated on the facts alleged by the plaintiffs. We must bear in mind, however, that we do not adhere to the traditional "in the light most favorable to the plaintiff" rule, but we view the facts "in the light most favorable to the plaintiff" as a reasonable officer would perceive them. *Gomez v. Atkinson*, 296 F.3d 253, 261 (4th Cir. 2002); *Sevigny v. Dicksey*, 846 F.2d 953, 957 (4th Cir. 1988). In this case, the facts as alleged by the plaintiffs are that on the night of March 3, 2002, Jordan undertook the escort at issue, entered the plaintiffs' property, and arrested the plaintiffs. Plaintiffs allege that the failure of Officer Jordan to remove Hodge was illegal, the failure to leave when requested by Mr. Phillips was illegal, and the seizure of the plaintiffs "when they were trying to seek aid of competent police officers to secure their property was illegal."

**Escort and Entrance onto Plaintiffs' Property**

The plaintiffs allege that since there is no written policy requiring Horry County Police Officers to provide escorts, it was improper to do so and was done without probable cause. The Fourth Amendment requires probable cause for searches and seizures. These officers did not initially go onto the plaintiffs' property with the intent to search or arrest anyone, they only entered and escorted to avoid a potential domestic dispute. Both plaintiffs and defendants agree that it was a custom and policy of Horry County Police Officers to provide escorts when requested. Plaintiffs allege that the escort was

9

done without probable cause because, as evidenced by her deposition, Paula, a minor, did not want an escort. Officer Jordan testified in his deposition that he was told by an Horry County Dispatcher to go to the Loris Police Department to meet with the complainant, who he identified as Paula. Even assuming that Paula did not want an escort, James Bryan, Paula's father, clearly wanted a police escort to take his daughter to the Phillips home and Officer Jordan was never informed that Paula did not want an escort. It appears from Paula's deposition testimony that the Loris Police Department dispatcher was informed that Paula did not want an escort and that the Phillips did not want Hodge on the property. It further appears from Paula's deposition testimony that her father told the Loris dispatcher he thought an escort was necessary because of guns in the house. Paula's stepmother also waned an escort because she was scared that Paula's stepfather, Mr. Phillips, would get a gun. Paula indicate that the Loris Police Department dispatcher told them to leave Hodge behind when they went to the Phillips home. It is unclear whether the Loris Police Department dispatcher and the Horry County Police dispatchers are one and the same; regardless, it appears that the dispatcher he talked to informed Jordan only that a complainant had requested for an escort.

The entrance of Officer Jordan onto the Phillips property was as a result of the request of Mr. Bryan to escort them to the Phillips home in order for Paula to retrieve her property. While Mrs. Phillips asked for Hodge to leave, it is not disputed that she said that everyone else could stay. While Mr. Phillips may have, at some point during the incident, told everyone to leave, the statement was not made until he was in the process of being arrested and Paula was still inside the house retrieving her clothes. It is undisputed that Paula had permission from both Mr. and Mrs. Phillips to be on the property. Plaintiffs have failed to provide any legal authority that the officers had no right to remain on their property where the daughter or her father requested an escort because of a fear of a domestic

10

dispute.  At the very least, plaintiffs have not provided any legal authority that it was clearly established that defendant Jordan did not have the right to remain there.  Consequently, this Court finds that, based on the facts as alleged, it would not "be clear to an objectively reasonable officer that his conduct violated [the] right" alleged to have been violated.  *See Brown*, 278 F.3d at 367.

**Plaintiffs' Arrest**

Plaintiffs assert in their response that their federal rights were violated by Officer Jordan falsely arresting them, falsely imprisoning them, and maliciously prosecuting them.  The federal rights alleged violated are those guaranteed by the Fourth and Fourteenth Amendments.  Plaintiffs allege that their allegations encompass their arrests as well as the force used to effect them.  However, there is no Fourteenth Amendment right, actionable under 42 U.S.C. § 1983, to be free from arrest without probable cause, or to be free from malicious prosecution.  *Albright v. Oliver*, 510 U.S. 266 (1994).  Consequently, the only right involved is the Fourth Amendment right to be free from unreasonable seizure, which encompasses common law claims for false arrest, false imprisonment and malicious prosecution.  *Lambert v. Williams*, 223 F.3d 257 (4th Cir. 2000).  The Fourth Amendment right to be arrested only on probable cause is clearly established.  *Smith v. Reddy*, 101 F.3d 351, 356 (4th Cir. 1996); *Brooks v. City of Winston-Salem*, 85 F.3d 178, 182 (4th Cir. 1996).  Probable cause requires facts and circumstances sufficient to warrant a prudent person to believe that the suspect has committed or is committing a crime.  *Porterfield v. Lott*, 156 F.3d 563, 569 (4th Cir. 1998).

To determine whether or not probable cause existed, we must examine the "totality of the circumstances" known to officers at the time of arrest.  *United States v. Al-Talib*, 55 F.3d 923, 931 (4th Cir. 1995).  The determination and existence of probable cause is a "practical, nontechnical conception," and it involves "factual and practical considerations of everyday life on which reasonable

11

and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175-176 (1949).

Reasonableness of arrest "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 395 (1989). An evaluation of reasonableness must include "allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation. *Id.* at 396-97.

The Phillips were arrested for common law misdemeanor breach of peace, a crime encompassing a wide range of conduct and permitting arrest and detention without warrant when committed in the presence of an officer. *See Atwater v. City of Lago Vista*, 532 U.S. 318 (2001) (discussing authority to arrest for breach of peace and *citing* S.C. Code Ann. § 17-13-30). The plaintiffs assert that they did not breach the peace.[13] This Court notes, however, that the question before it is not whether plaintiffs breached the peace, but whether Officer Jordan's actions were objectively reasonable considering the facts of this case and entitled to qualified immunity.

Breach of peace is defined as "a violation of public order, a disturbance of the public tranquility, by any act or conduct inciting to violence, which includes any violation of any law enacted to preserve peace and good order." *South Carolina v. Poinsett*, 157 S.E.2d 570, 571-72 (S.C. 1967); *see also In re Jeremiah W.*, 576 S.E.2d 185 (S.C. Ct. App. 2003). Whether conduct constitutes a breach of the peace depends on time, place, and nearness of other persons. *In re Jeremiah W.*, *supra*. *South Carolina*

---

[13] Plaintiffs claim that the charges were dismissed against them because they had no merit. It does appear that the charges against Mrs. Phillips were dropped. However, a letter from Carroll Padgett, Jr., plaintiffs' counsel in the criminal matter, dated October 14, 2002, to Central Traffic Court in Conway states:

> Pursuant to your telephone conversation with Colleen, please find enclosed letters from Pastor Van L. Loomis, Jr. and Gene Stevens indicating that Mr. Phillips has completed the mowing of three (3) cemeteries per his community service requirement.
>
> Mr. Phillips has now fully complied with the Court sentence and requests that his records be expunged in regard to the above-referenced [breach of peace] matter.

*v. Peer*, 466 S.E.2d 375, 378 (S.C. Ct. App. 1996).  Breach of peace can occur when conduct causes "nervousness, frustration, anxiety," for other persons or causes a breach of peacefulness in a neighborhood.  *In re Jeremiah W.*, 576 S.E.2d 185 (S.C. Ct. App. 2003) (overruled on other grounds 2004 WL 2851805 (unpublished)).

At the time of the arrests, Mrs. Phillips had given express permission[14] for everyone except for Paula's boyfriend to stay on the property.[15]  In her deposition, Frances Bryan testified that she was nervous and anxious about Mr. Phillips' behavior and access to guns.  She also indicates that she specifically expressed this concern to the officers.  Officer Jordan testified in his deposition that when Mr. Phillips came out on the front porch "[h]e'd made some threats about removing us from his property, went back into his house, which I assumed the worse, thought maybe he was going for a firearm or some sort of weapon, took some cover behind a vehicle that was in the driveway.  He came out with a telephone in his hand, which was quite a relief."

Mrs. Phillips admits that she stepped between her husband and Officer Jordan in an attempt to keep her husband from being arrested.  When Officer Jordan asked her to get out of the way, she did not get out from between Officer Jordan and Mr. Phillips.[16]  The 911 transcript indicates that Officer Jordan stated, "Just stop.  Don't you hit me."[17]  Although there is no indication who he is talking to;

---

[14] *See* Deposition of Dianne B. Phillips, p. 55.

[15] The Court notes that while Fourth Amendment generally prohibits the warrantless entry of a person's home, *Payton v. New York*, 445 U.S. 573 (1980), the prohibition does not apply to situations in which voluntary consent has been obtained, either from the individual whose property is searched, *see Schneckloth v. Bustamonte,* 412 U.S. 218 (1973), or from a third party who possesses common authority over the premises, *see United States v. Matlock*, 415 U.S.164 (1974).

[16] *See* Deposition of Dianne B. Phillips, p. 63.

[17]
|  |  |
|---|---|
| WOMAN: | Let him in the house and I will talk with him. |
| PHILLIPS: | Just let me sit down.  Don't hurt her--don't hurt her. |
| WOMAN: | Get him off of me. |
| PHILLIPS: | Don't hurt her man.  Don't hurt her.  Come on, leave her alone.  Leave her alone she ain't |

however, it is clear that it is either Mr. or Mrs. Phillips.

At the time of the arrest, Officer Jordan was aware that he had been asked to escort Paula to the Phillips property to retrieve her clothes and treated this as having the potential for a domestic dispute. He knew that the situation was emotional and tense and that the people present, Mrs. Bryan for instance, were nervous and anxious. Jordan had been informed that there were guns in the Phillips home. Both Mr. and Mrs. Phillips were immediately openly hostile and rude towards the officers, with Mr. Phillips questioning whether the officers were in fact law enforcement officers, despite their uniforms and marked vehicles. Mrs. Phillips approached the car and attempted to open the car door. Mr. Phillips was on the phone with the 911 dispatcher and, despite the fact that both Jordan and Sawyer were in marked police cruisers, stated "two fellows here claim to be county cops that's brought some people on my land. I've told them to get the people off my land and **I've told 'em my last time**" (emphasis added). Mr. Phillips' statement that "I've told 'em my last time" could easily have been perceived as a threat to the safety of the officers. From a reasonable officer's perspective, it appears that Officer Jordan took what action he thought was reasonably necessary to defuse the situation and prevent it from escalating even more. After he began arresting Mr. Phillips, Mr. Phillips tried to retreat into the house and Mrs. Phillips even got between her husband and Officer Jordan in an attempt to prevent her husband's arrest. Based on the "totality of the circumstances" known to officers at the time of arrest this Court concludes that Jordan had probable cause to arrest the plaintiffs.

This Court concludes that, based on what he knew at the time, it was not unreasonable for

---

|  |  |
|---|---|
|  | bothering you, man. |
| WOMAN: | All of you back here |
| OFFICER: | Just stop. Don't you hit me. |

911 Transcript March 3, 2002, p. 3-4.

Officer Jordan to arrest the plaintiffs. Consequently, this Court finds that, based on the facts as alleged, it would not "be clear to an objectively reasonable officer that his conduct violated [the] right" alleged to have been violated and, therefore, Jordan is entitled to qualified immunity. *See Brown*, 278 F.3d at 367.

**Excessive Force Claim**

Plaintiffs allege that Officer Jordan violated their federal rights by using excessive physical force during arrest and custody. When considering an excessive force claim brought pursuant to 42 U.S.C. § 1983, a court should begin its analysis by first identifying the specific constitutional right allegedly infringed upon. *Graham v. Connor*, 490 U.S. 386, 394 (1989). "The Fourth Amendment governs claims of excessive force during the course of an arrest, investigatory stop, or other 'seizure' of a person." *Riley v. Dorton*, 115 F.3d 1159, 1161 (4th Cir. 1997) (*citing Graham*, 490 U.S. at 388). Thereafter, the Fourteenth Amendment's due process clause protects a pretrial detainee from the use of excessive force that amounts to punishment. *Graham*, 490 U.S. at 395 n. 10. Here, since the alleged excessive use of force occurred during an arrest, plaintiffs' claims are evaluated under the Fourth Amendment. Additionally, to the extent the plaintiffs allege excessive force subsequent to arrest, i.e. in the police car on the way to the Horry County Detention Center, their claims are evaluated under the Fourteenth Amendment. However, for the purposes of the Court's analysis, the standards applicable to Fourth Amendment excessive force claims apply with equal force to Fourteenth Amendment excessive force claims. *Valencia v. Wiggins*, 981 F.2d 1440, 1446 (5th Cir. 1993).

Under the Fourth Amendment, claims of excessive use of force during an investigatory stop or arrest are consider under an "objective reasonableness" standard. This test requires "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the

15

importance of the governmental interest alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985); *see also Sweatt v. Maryland*, 1989 WL 126582 at **1 (4th Cir. 1989) (unpublished); *White v. Town of Chapel Hill*, 899 F. Supp. 1428, 1435 (M..D. N.C. 1995), *aff'd* 70 F.3d 1264 (4th Cir. 1995). When considering a police officer's actions under this "objective reasonableness" standard, the Court must consider the circumstances of the particular case, including the severity of the crime committed, whether the subject posed an immediate threat to the safety of the police officers or others, and whether the subject was actively resisting arrest or attempting to evade arrest. *Graham*, 490 U.S. at 396; *see also Foote v. Dunagan*, 33 F.3d 445, 447-448 (4th Cir. 1994); *Martin v. Gentile*, 849 F.2d 863, 869 (4th Cir. 1988). What is objectively reasonable depends on what conditions exist at the time the alleged excessive force is used, recognizing that police officers are often forced to make split second judgments in circumstances that are tense, uncertain, and rapidly evolving. *Graham*, 490 U.S. at 396; *see also Greenidge v. Ruffin*, 927 F.2d 789 (4th Cir. 1991). While no one factor is controlling, the extent of any injuries to the plaintiff is also a relevant consideration. *See Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994). Reasonableness of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor, supra.*

Officer Jordan's state of mind, as discussed above, was that he was dealing with two irate individuals. He was asked to escort the Bryans in order for Paula to pick up her personal belongings because the Bryans feared some sort of domestic dispute. This assertion is supported by the deposition testimony of Officer Sawyer that Paula told him that she was afraid that her mother would "Throw a fit" because she "knew her mother." When Jordan began to arrest Mr. Phillips, it is undisputed that Mrs. Phillips attempted to prevent the arrest. Neither of the Phillips dispute that they did not follow Jordan's requests for them to calm down and for Mrs. Phillips to move out of the way. It is reasonable

16

for an officer to believe that if an individual has already disobeyed one direct order he will "balk at being arrested." *Brown v. Gilmore*, 278 F.3d 362, 369 (4th Cir. 2002). "If an officer reasonably, but mistakenly, believe[s] that a suspect is likely to fight back . . . the officer would be justified in using more force than in fact [is] needed." *Saucier v. Katz*, 533 U.S. 194, 205 (2001) (interpreting standard of reasonable force on merits of § 1983 claim as decided in *Graham v. Connor, supra*.). Plaintiffs' pre-arrest behavior was sufficient to justify the force used and the amount of force use was also required to complete the arrests once they resisted.

Any injuries the plaintiffs received were minimal under the circumstances and, therefore, insufficient to establish a claim of excessive force. *See Carter v. Morris*, 164 F.3d 215, 219 (4th Cir. 1999). The Booking Report reflects that Mr. Phillips reported a wrist abrasion and Mrs. Phillips reported that her back and wrist hurt. The emergency room report made the following day reflect superficial redness on Mrs. Phillips wrists, back tenderness, and a scratch on her knee. Mr. Phillips complained of wrist abrasion as well as recurrence of his umbilical hernia (he had hernia surgery six (6) months prior to this incident). Neither plaintiff received any further treatment.

Redness, soreness, swelling of the wrists, muscle spasms, cuts, scrapes, scratches, bruises, and back pain following a resisted arrest, which cause no permanent injury, are *de minimis*, and do not support excessive force claims. *Brown*, 278 F.3d at 369; *Martin v. Gentile*, 849 F.2d 863 (4th Cir. 1988); *Darnell v. Phillips*, 914 F.2d 247 (4th Cir. 1990). Neither is applying handcuffs too tightly considered excessive force. *Carter v. Morris, supra*. Even viewing the evidence in the light most favorable to the plaintiffs, it is evident that the officers faced a tense situation, that the Officers believed the plaintiffs posed a risk to safety, that the plaintiffs were uncooperative and resisted arrest and that they received only minor, temporary injuries. Consequently, the force used to effect the arrests was

17

justified.  This Court finds that, based on the facts as alleged, it would not "be clear to an objectively reasonable officer that his conduct violated [the] right" alleged to have been violated.  *See Brown*, 278 F.3d at 367.

## County Custom, Policy or Oversight

Next, Defendant Horry County moves for summary judgment on the basis that, in the instant action, there is no municipal liability under 42 U.S.C. § 1983.  Municipalities and other local governmental units cannot be sued on a *respondeat superior* theory for the unconstitutional acts of their employees.  *Monell v. Department of Social Servs.*, 436 U.S. 658, 690-91 (1978).  However, local governing bodies, such as counties, municipal corporations, and school boards, are "persons" that can be sued directly under § 1983 for monetary, declaratory, or injunctive relief when alleged unconstitutional action executes governmental policy or custom.  *Monell*, 436 U.S. at 690-91.  To establish municipal liability, a plaintiff must show that the city's policies caused the constitutional violation. *McMillian v. Monroe County*, 520 U.S. 781, 784 (1997).  A municipality is responsible only when execution of its policy or custom, whether made by its lawmakers or by those whose acts may fairly be said to represent official policy, inflicts injury.  *See Monell*, 436 U.S. at 694; *Spell v. McDaniel*, 824 F.2d 1380, 1385 (4th Cir. 1987).  When a constitutional deprivation is not an official act of a municipality, recovery only lies against an officer in his individual capacity.  *Hughes v. Blankenship*, 672 F.2d 403, 405-06 (4th Cir. 1987).

Local government units are liable only if an official's execution of a municipal policy, practice, or custom caused the injury, *Monell*, 436 U.S. at 694 (1978); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 818-19 (1985), or a failure to train amounting to "deliberate indifference to the rights of persons with whom [the employees] come into contact" leads to unconstitutional conduct.  *City of Canton v.*

18

*Harris*, 489 U.S. 378, 388 (1989); *Carter v. Morris*, 164 F.3d 215 (4th Cir. 1999).  A policy or custom for which a municipality may be held liable can arise in four (4) ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifests deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."  *See Id.*

An official policy or custom need not itself be unconstitutional in order to hold a municipality liable. *Id.*  In order to hold a county responsible for the actions of its officers, a plaintiff must point to some evidence that the county had in place a policy or custom which allowed the constitutional violation to occur.  *Washington v. Whitaker*, 451 S.E.2d 894 (S.C. 1994).  In other words, § 1983 liability requires "an affirmative link between the policy and the particular constitutional violation alleged." *City of Oklahoma City*, 471 U.S. 808.  "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipality policy, which policy can be attributed to a municipality policy-maker." *City of Oklahoma City*, 471 U.S. at 824.

The plaintiffs contend that Horry County violated the same constitutional rights they allege Jordan violated "by the implementing of a custom, policy or official act or by failing to train or supervise its officers in the use of excessive force, making arrests, probable cause in making an arrest, and in allowing police escorts when there is no suspicion of any crime being committed or about to be committed." (Consolidated Memo in Response to Motion for Summary Judgment, p. 16.)  They argue that there is no mandate in the Police Manual or Procedures to provide an escort "for a minor child to pick up her clothing when switching custody from one parent to another" and that there was "no

suspicion of a crime having been committed or about to be committed or that there is some suspicion there will be criminal domestic violence."  (Opposition to Motion for Summary Judgment p. 6-7.)

The facts as alleged by the plaintiffs do not support their assertion that there was "no suspicion of a crime having been committed or about to be committed or that there is some suspicion there will be criminal domestic violence" when the escort was requested.  To the contrary, Jordan and Sawyer as well as the Bryans feared a potential domestic dispute.  As discussed above Frances Bryan was fearful of the situation and Sawyer testified that Paula herself told him that she thought her mother would "Throw a fit."  This is clearly not a situation where there was "no suspicion."

The plaintiffs have put forth no evidence in response to the motion for summary judgment to support the County's alleged liability under § 1983.  The defendants have submitted written policies on the use of force incident to arrest, transporting detainees, and responding to domestic calls.  Johnny Morgan, the Horry County Chief of Police, submitted an affidavit stating that Officer Jordan received South Carolina Criminal Justice Academy training, on the job training, and a copy of the policies provided to the plaintiffs during discovery.  Officer Jordan is a patrol officer, not a supervisor that could establish County Policy.  Additionally, the plaintiffs have produced no evidence of any widespread use of excessive force by Horry County police officers, only that the conduct is capable of repetition. Therefore, the Court finds that the plaintiffs have failed to establish liability subsequent to a municipal policy or custom sufficient to satisfy *Monell*.

## State Law Claims

Having granting summary judgment as to all federal law claims, the Court declines to exercise supplemental jurisdiction over the plaintiffs' state law claims under 28 U.S.C. § 1367(c), and this case is remanded to the Court of Common Pleas of Horry County.

## <u>Conclusion</u>

For the foregoing reasons, the undersigned **GRANTS** the defendants' motions for summary judgment on all federal law claims and **REMANDS** the plaintiffs' state law claims to the Court of Common Pleas of Horry County.  All other pending motions are denied as **MOOT**.

**AND IT IS SO ORDERED.**

s/ R. Bryan Harwell
R. Bryan Harwell
United States District Judge

September 29, 2005
Florence, South Carolina